158 P.3d 69 (2007)
In re DETENTION OF Harry Vern FOX, Appellant,
v.
STATE of Washington, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Respondent.
In re Detention of Robert M. Jones aka Robert Benjamin, Appellant,
v.
State of Washington, Department of Social and Health Services, Respondent.
In re the Detention of Anthony Jacka, Appellant,
v.
State of Washington, Department of Social and Health Services, Respondent.
Nos. 34145-0-II, 33596-4-II, 35221-4-II.
Court of Appeals of Washington, Division 2.
May 1, 2007.
*71 Sheri Lynn Arnold, Attorney at Law, Tacoma, WA, for Appellant.
Eric J. Nielsen, Nielsen Broman & Koch PLLC, Seattle, WA, Darrel S. Ammons Jr., Attorney at Law PLLC, Longview, WA, for Petitioner.
Malcolm Ross, Attorney General of Washington, Todd Richard Bowers, Attorney General, Seattle, WA, Ray Waldo Hinea III, Attorney at Law, Vancouver, WA, for Respondent.
HUNT, J.
¶ 1 Harry Fox, Robert Jones, and Anthony Jacka ("SVPs") are ch. 71.09 RCW sexually violent predators (SVP). Fox appeals the trial court's summary judgment dismissal of a full evidentiary hearing/SVP recommitment trial it had previously ordered.[1] We granted Jones' request for discretionary review of a trial court order denying his request for a new commitment trial. We granted Jacka's similar request for discretionary review of a *72 trial court order (1) ruling amended RCW 71.09.090 constitutional, and (2) denying his request for a full evidentiary hearing/SVP recommitment trial. We have consolidated these cases on appeal.
¶ 2 Fox, Jones, and Jacka argue that their respective superior courts should have granted their requests for full fact-finding recommitment hearings under chapter 71.09 RCW to consider their present dangerousness and readiness for release because (1) their conditions had changed since their original SVP commitments; (2) compared with other methods previously used to determine dangerousness, their expert actuarial data demonstrated lower risk for them to re-offend; and (3) legislative amendments to the SVP Act, denying a new evidentiary hearing when a petitioner alleges a change in only a single demographic factor, violate the separation of powers doctrine and petitioners' rights to due process and the equal protection of the law. In addition, (1) Fox argues that the trial court improperly applied the RCW 71.09.090 amendment retroactively to him, and (2) Jacka argues that he merits a full evidentiary hearing regardless of the amendment's constitutionality.
¶ 3 Holding that the SVP Act amendments to RCW 71.09.090 are constitutional as enacted and as applied to the three SVPs here, we affirm the trial courts' denial of Jones' and Fox's requests for full evidentiary recommitment hearings. We reverse the trial court's denial of Jacka's request and remand for a full evidentiary hearing.

FACTS
¶ 4 Fox, Jones, and Jacka were originally committed as sexually violent predators (SVPs) under ch. 71.09 RCW. All three requested full evidentiary hearings to reevaluate their continued commitment. Effective May 2005, our Legislature amended RCW 71.09.090, the statute governing annual review hearings for SVPs. This new legislation allowed a new SVP trial in certain circumstances and disallowed a hearing where an SVP alleges a change in only a single demographic factor. None of the three SVPs here had full evidentiary SVP recommitment hearings before the May 2005 effective date of these SVP Act amendments. Following this amendment, the trial courts for these three SVPs denied their requests for evidentiary hearings. Thus, Fox, Jones, and Jacka remained committed as SVPs.

I. Fox
¶ 5 In 1999, a jury convicted 56-year-old Harry Fox of communicating with a minor for immoral purposes. By his own admission, Fox is a pedophile with a history of 30 victims.[2] In 2002, he stipulated to civil commitment as a sexually violent predator under ch. 71.09 RCW.
¶ 6 In October 2004, the superior court conducted Fox's annual review hearing, as required by the SVP Act, and set a date for a show cause hearing to consider an annual review report and to determine whether Fox still met the statutory criteria for continued SVP commitment.[3] The State submitted an annual review prepared by Dr. Jason Durham, a licensed clinical psychologist at the Special Commitment Center for SVPs at McNeil Island, where Fox was being detained and treated. Dr. Durham's review documented that Fox continued to suffer from pedophilia and personality disorder not otherwise specified (NOS) with antisocial and histrionic features. After six years in treatment, Fox remained in phase one of the center's six-stage treatment program. Durham concluded that Fox remained at a high risk for re-offending.
¶ 7 In February 2005, Fox submitted a declaration and opinion from Dr. Richard Wollert, a private psychologist specializing in SVP assessment. Using an actuarially-derived risk assessment called the "Bayes Theorem," Dr. Wollert opined that Fox's recidivism *73 risk was 11 percent. Although Dr. Wollert interviewed Fox, he based his opinion on deficiencies in assessing recidivism risk through clinical diagnoses and the reliability of age-based risk assessment. Dr. Wollert concluded that, solely because Fox was then 61 years old, he was unlikely to re-offend based on statistical data showing a general tendency for reduction in predatory offense as a pedophile ages.
¶ 8 Based on Dr. Wollert's statistical data and opinion at the March 3, 2005 show-cause hearing, the trial court granted Fox's request for a full evidentiary hearing and scheduled it for December 8, 2005.
¶ 9 After the Legislature amended the SVP Act, the State moved for summary judgment, arguing that the amendment's language allowed the trial court to order or to hold a full evidentiary recommitment hearing only if the SVP demonstrated a qualifying change in condition. Agreeing with the State's interpretation of this statutory amendment, the trial court ruled that it could not conduct a new SVP hearing based solely on evidence of Fox's change in a single demographic factor, namely that he had reached an age at which there was generally a lowered likelihood of reoffending. The trial court granted the State's motion for summary judgment and cancelled Fox's hearing.

II. JONES
¶ 10 Thirty-five-year-old Robert Jones has been confined since he was 17 years old. He pleaded guilty to an indecent liberties charge when he was 15 years old. He pleaded guilty to second degree rape and rape of a child when he was 17 years old, and was sentenced to prison. On his release from prison, Jones stipulated to civil commitment as a SVP in October 1995. Between then and now, Jones dropped out of SVP treatment for approximately 18 months.
¶ 11 By the time of his January 2005 annual review in superior court, Jones had reentered treatment and was at phase three of the six-phase program. Dr. Holly Coryell's annual review evaluation surveyed Jones' history and current condition; Dr. Coryell found that Jones still met the criteria for continued SVP commitment because he had recently admitted to maintaining his attraction to young boys.
¶ 12 Jones hired Dr. Wollert as a forensic SVP expert. Dr. Wollert's report documented statistical evidence about the risk of a juvenile sex offender's committing additional sexual crimes as an adult. Dr. Wollert (1) challenged Dr. Coryell's use of the Static 99 Test (a common test for predicting recidivism risk), asserting that there is little evidence of the test's accuracy for predicting future recidivism based on juvenile offenses; (2) observed that most common clinical tests are not appropriate for testing recidivism rates among juveniles; (3) put Jones' risk of re-offending at no higher than ten percent, based on an actuarial study in Wisconsin; and (4) opined that Jones had never met the statutory requirements for an SVP. Dr. Wollert, however, did not address Jones' individual history, diagnoses, or change in condition brought about through his SVP treatment.
¶ 13 Jones then challenged the annual report, thus triggering a show cause hearing to determine whether there was probable cause to conduct a full evidentiary recommitment hearing. The trial court set the show cause hearing for June 10, 2005. Before the show cause hearing, Jones submitted Dr. Wollert's report to the trial court. The State responded that Dr. Wollert's report did not merit a new SVP commitment hearing.
¶ 14 On June 16, the trial court denied Jones' request for a new commitment hearing. The trial court ruled that Dr. Wollert's declaration failed to make a prima facie showing of physiological changes in Jones or "a change in his mental condition brought about by treatment."

III. JACKA
¶ 15 Thirty-nine-year-old Anthony Jacka has a history of sexually violent offenses against adult women and teenage girls. He admitted having raped a 14-year-old girl at knifepoint and having attempted to rape a woman sleeping next to her child, for which the trial court sentenced him to prison in 1990. At the end of Jacka's prison sentence, the State petitioned to commit him as a SVP. In 1999, the trial court found that Jacka met *74 the SVP criteria and committed him to the Special Commitment Center, where he has remained since.
¶ 16 In January 2005, the State submitted a report from Dr. Durham for Jacka's annual review. Dr. Durham described Jacka's diagnosis of paraphilia NOS, voyeurism, exhibitionism, alcohol and cannabis abuse, and antisocial personality disorder. Dr. Durham also observed, however, that Jacka had progressed in his treatment, specifically noting that:
[Jacka] has not been a behavior problem at the SCC and has attended and actively participated in individual and group treatment. He has a solid understanding of sex offender treatment concepts and offers good feedback to other residents in the group. However, he continues to demonstrate anger when confronted, hold feelings of entitlement, and be argumentative with his treatment team and toward the SCC. That being said, it seems that he has progressed in these areas over the past several months to the point at which it appears he is now working with his treatment team instead of against them.
Appendix A to Br. of Resp't at 10-11.
¶ 17 Nonetheless, Dr. Durham found that Jacka still posed a high risk of danger to the community. Even though Dr. Durham believed that the State could safely move Jacka to a less restrictive environment, Dr. Durham did not believe such a move would be in Jacka's best interests.
¶ 18 Jacka retained Dr. Wollert to provide an expert opinion on his behalf. Dr. Wollert based part of his opinion on the improvements Jacka had made in his treatment program, including his ability (1) to abstain from alcohol; (2) to control his sexual behavior; (3) to benefit from treatment in the form of controlling his anger; and (4) to receive lower recidivism risk scores on the PCL-R tests. Dr. Wollert further noted that (1) the Special Commitment Center had filed only one behavioral management report against Jacka in the previous five years, (2) none of these reports stemmed from physically assaultive or threatening behavior by Jacka, and (3) Jacka's "project work"[4] during treatment "shows a level of understanding attained by only a small percentage of non-predatory offenders." Appendix B at 24-25.
¶ 19 Dr. Wollert also used new risk-assessment techniques to analyze Jacka's older clinical information. The bulk of Dr. Wollert's opinion focused on changes in evaluation techniques in general, rather than on Jacka's treatment progress in particular. Reassessing Jacka through new risk evaluations and Jacka's improvement at the Special Commitment Center, Dr. Wollert concluded that Jacka had changed so significantly that he no longer met the requirements for continued commitment under the SVP Act.
¶ 20 The superior court scheduled a show cause hearing for Jacka to determine whether there was probable cause to conduct a full evidentiary recommitment hearing. At the March 3, 2006 show cause hearing, the trial court denied Jacka's request for an evidentiary hearing. The court ruled that (1) amended RCW 71.09.090 is constitutional; and (2) Jacka's evidence, focusing on new risk-assessment methods, was insufficient to warrant a new hearing.
¶ 21 Fox appealed. We granted discretionary review to Jones and Jacka. We consolidated these three cases.

ANALYSIS

I. SVP AMENDMENTRCW 71.09.090
¶ 22 The 2005 amendment to RCW 71.09.090 expressly provides, in pertinent part: "[A] change in a single demographic factor, without more, does not establish probable cause for a new trial proceeding," specifically including "a change in the chronological age . . . of the committed person." RCW 71.09.090(4)(c). Fox, Jones, and Jacka challenge this legislative provision, which, in essence, states that a change in a SVP's age alone does not demonstrate probable cause for a full evidentiary hearing to consider *75 whether continued SVP commitment is warranted. RCW 71.09.090.

A. Background
¶ 23 RCW 71.09.090(4)(b) provides that a "new trial proceeding"[5] may be ordered, or held, only when there is current evidence from a licensed professional of one of the following and the evidence presents a change in condition since the person's last commitment trial proceeding:
(i) An identified physiological change to the person, such as paralysis, stroke, or dementia, that renders the committed person unable to commit a sexually violent act and this change is permanent; or
(ii) A change in the person's mental condition brought about through positive response to continuing participation in treatment which indicates that the person meets the standard for conditional release to a less restrictive alternative or that the person would be safe to be at large if unconditionally released from commitment.
¶ 24 In the findings accompanying its amendment to the SVP Act, the Legislature documented that RCW 71.09.090 provides a mechanism for an SVP to demonstrate a change in his condition, potentially justifying reconsideration of continuing commitment, rather than an opportunity to attack his original SVP commitment collaterally. 2005 c. 344 § 1. The Legislature specifically cited court decisions In re Detention of Young, 120 Wash.App. 753, 86 P.3d 810, review denied, 152 Wash.2d 1035, 103 P.3d 201 (2004)[6] and In re Detention of Ward, 125 Wash.App. 381, 104 P.3d 747, review denied, 155 Wash.2d 1025, 126 P.3d 820 (2005),[7] as misapplications of its legislative intent in defining the "so changed" language triggering a full evidentiary hearing under RCW 71.09.090.2005 c. 344 § 1.
¶ 25 Thus, the 2005 SVP Act amendments, *76 effective immediately upon their enactment,[8] expressly noted that (1) the law presumes SVPs will generally require long-term treatment for their mental disorders; and (2) thus, a single change in a demographic factor should not constitute a change in condition warranting reconsideration of an individual SVP's commitment.[9]

B. Retroactivity
¶ 26 Fox first argues that the amended version of RCW 71.09.090 did not apply to him because the trial court had already ordered a new evidentiary hearing before the amendments' effective date, and the amendments were not retroactive. We disagree.

1. Standard of review
¶ 27 Construction of a statute is a question of law, which we review de novo under the error of law standard. Pasco v. Public Empl. Relations Comm'n, 119 Wash.2d 504, 507, 833 P.2d 381 (1992); Inland Empire Distrib. Sys., Inc. v. Util. & Transp. Comm'n, 112 Wash.2d 278, 282, 770 P.2d 624 (1989). Our obligation is to give effect to the intent of the Legislature. Review begins with the plain language of the statute. Lacey Nursing Ctr., Inc. v. Dep't of Revenue, 128 Wash.2d 40, 53, 905 P.2d 338 (1995).
¶ 28 A statute does not operate retroactively simply because a court applies the statute to a case stemming from conduct antedating the statute's enactment, or disrupts expectations based in prior law. Rather, the court must ask whether the new law or amendment attaches new legal ramifications to events completed before the statute's enactment. See Landgraf v. USI Film Prods., 511 U.S. 244, 255-56, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).
¶ 29 That a statute has a retroactive application does not render the statute unconstitutional. For example, a statute that clarifies, rather than alters, a current law does not operate retroactively even when applied to transactions conducted before its enactment. See e.g., In re Detention of Elmore v. State, 134 Wash.App. 402, 139 P.3d 1140 (2006), (no retroactive application when the court applied amendments that clarified the legislature's definition of the change required for a new SVP hearing) (review granted, No. 79208-9, 158 Wash.2d 1025, 152 P.3d 347 (Jan. 3, 2007)); Shelter America Corp. v. Ohio Cas. and Ins. Co., 745 P.2d 843, 845-46 (Utah Ct.App.1987) (a court could apply a statute including mobile homes in the definition of "motor vehicles" because the law merely clarified the meaning of motor vehicle from an earlier statute.). Moreover, legislation that readjusts rights and burdens is not unlawful for the sole reason that it disturbs settled expectations. See DIRECTV, Inc. v. F.C.C., 110 F.3d 816, 825-26 (D.C.Cir.1997).

2. Plain language of the statute
¶ 30 In March 2005, the superior court granted Fox's request for a full evidentiary hearing on his continued SVP commitment and set it for December 8. In May, the Legislature amended RCW 71.09.090 to allow a court to order or to hold a hearing only when there is probable cause that the defendant's condition has undergone a substantial change warranting reconsideration of his SVP commitment. The Legislature clarified that such substantial change cannot be based on a single demographic factor, such as age. Thus, in September 2005, the State moved for summary judgment, reasoning that the statutory amendments did not allow a new trial for Fox because he had alleged only a change in his age.
¶ 31 The plain language of the statute demonstrates that the new amendments applied both to probable cause (show cause) hearings as well as to full evidentiary hearings that trial courts had scheduled but had not yet conducted. The Legislature's use of the conjunctive "or" ("[a] new trial proceeding under subsection (3) of this section may *77 be ordered, or held, . . .") demonstrates that a trial court may neither order nor hold a new hearing when the sole basis for the hearing is a change in a single demographic factor. RCW 71.09.090(4)(b). If the Legislature did not intend this amendment to apply to previously-ordered hearings, not yet held, it would not have used this specific language. Thus, the only conclusion to draw from the plain language of the statute is that the Legislature intended the amendment to apply to hearings that trial courts had already ordered but had not yet held.
¶ 32 We have previously considered this same statutory language applied in the same manner in Elmore, 134 Wash.App. at 418, 139 P.3d 1140. Based on the 2005 statutory amendments to RCW 71.09.090, we reversed the trial court's grant of a new evidentiary hearing to SVP Elmore. Similar to the three SVPs here, Elmore sought a new hearing based on Dr. Wollert's testimony before the May 2005 amendments to RCW 71.09.090. Citing Young, the trial court initially granted Elmore a new hearing because at the time of his review, Elmore was then older than he had been when he was originally committed. 134 Wash.App. at 412, 139 P.3d 1140. In reversing the trial court's grant of a new commitment hearing, we reasoned that the amendments clarified the Legislature's intent that a trial court could not order a new hearing based solely on an SVP's change in age. 134 Wash.App. at 419-20, 139 P.3d 1140.
¶ 33 Fox argues that the trial court applied RCW 71.09.090 retroactively, and that this retroactive application unconstitutionally affected his substantive rights. Fox reasons that the statute's use of the future tense "may be held" is indicative of the Legislature's intent that courts apply the amendments prospectively only. Again, we disagree. As we note above, using the conjunction "or," together with the Legislature's express order that the amendment would take effect immediately, shows that the Legislature intended the law to affect both hearings pending at the probable cause stage and full evidentiary hearings that trial courts had yet to hold.

3. No vested right to full evidentiary hearing on continued SVP commitment
¶ 34 Fox further argues that this reading of the amendments' plain language renders them unconstitutional as applied to him because he had a vested right to a new SVP commitment trial under the Act's former version. See In re Bankruptcy of F.D. Processing, Inc., 119 Wash.2d 452, 462-63, 832 P.2d 1303 (1992) (courts cannot retroactively apply amendments when they deprive litigants of vested rights). We disagree.
¶ 35 Division I of our court recently addressed this identical issue in Detention of Smith v. State, 137 Wash.App. 319, 153 P.3d 226 (2007). In Smith, a trial court granted an SVP a new commitment trial, reasoning that his increased age made him no longer likely to commit a predatory act of sexual violence. But after the 2005 amendments to the SVP Act, the court struck Smith's new commitment trial. Smith appealed, arguing that the SVP Act amendments' retroactive effect violated the separation of powers doctrine. Smith, 137 Wash.App. at 327-328, 153 P.3d 226. Division I rejected Smith's argument, reasoning that an expectation that there would be no change in the SVP release criteria under RCW 71.09.090 did not vest existing SVPs with a right to have recommitment hearing requests evaluated according to the pre-2005 criteria. Smith, 137 Wash. App. at 330, 153 P.3d 226, citing In re Estate of Burns, 131 Wash.2d 104, 116, n. 2, 928 P.2d 1094 (1997).[10]
¶ 36 Similarly, the Arizona Supreme Court recently held that a committed SVP does not have a vested right in a jury trial under a previous version of Arizona's SVP Act. See In re Commitment of Frankovitch, 211 Ariz. 370, 121 P.3d 1240 (2005). When the State of Arizona sought to commit Frankovitch as an SVP, the governing statute allowed either the State or the person to be committed to request a jury trial. 121 P.3d at 1242. The *78 Arizona Legislature subsequently amended the law such that at the time of Frankovitch's SVP commitment, he was no longer statutorily entitled to a jury trial. Id. He argued that the amended statute was unconstitutional because it operated retroactively to deprive him of a preexisting right to a jury trial. Id. The Arizona Supreme Court disagreed, reasoning that Frankovitch had only a contingent right to a jury trial and, thus, the trial court could retroactively apply the amended statute.
¶ 37 Washington courts have long held that the Legislature does not deprive a litigant of a vested right when it clarifies existing rules of evidence or causes of action. See e.g., Haddenham v. State, 87 Wash.2d 145, 148-49, 550 P.2d 9 (1976); Superior Asphalt & Concrete Co. v. Dep't of Labor and Indus., 19 Wash.App. 800, 805, 578 P.2d 59 (1978). As in Frankovitch, Fox's asserted "right" to a trial on whether his SVP commitment should end, both preand post-SVP Act amendment, was and is contingent on his showing that his mental or physical condition had substantially changed. The Legislature's amendments merely clarified the type of evidence Fox needed to submit to obtain a new commitment hearing. Thus, the May 2005 amendments to RCW 71.09.090 did not deprive him of a "vested right" to a recommitment trial.
¶ 38 Therefore, based on the plain language of the SVP Act May 2005 amendments, we adopt Division I's rationale in Smith and hold that (1) Fox had no vested right to an SVP recommitment trial applying the pre-2005-amendment criteria; and (2) the trial court did not err in granting the State's summary judgment motion to strike Fox's hearing when he did not meet the post-2005-amendment criteria for holding a new commitment trial proceeding.

C. Separation of Powers
¶ 39 All three SVPs here argue that the 2005 RCW 71.09.090 amendments violate the separation of powers doctrine. This argument also fails.
¶ 40 The separation of powers doctrine stems from "the constitutional distribution of the government's authority into three branches." State v. Moreno, 147 Wash.2d 500, 505, 58 P.3d 265 (2002). While a law or order should never threaten the independence or integrity of the judicial branch, governmental branches are not "hermetically sealed." Carrick v. Locke, 125 Wash.2d 129, 135, 882 P.2d 173 (1994). Thus, the question here is not whether the legislative and judicial branches are engaging in coinciding activities, but rather the question is whether RCW 71.09.090 threatens the independence of the judiciary. See Moreno, 147 Wash.2d at 505-06, 58 P.3d 265.
¶ 41 While the separation of powers doctrine precludes the Legislature from making legal conclusions, the Legislature may pass laws that directly impact pending cases in Washington courts. See Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 143-44, 744 P.2d 1032 (1987) ("statute prescribing new rules to be applied to pending litigation is generally constitutional [and] does not violate the separation of powers clause").[11] Here, it is the Legislature's prerogative to clarify the definition of when a committed SVP's mental or physical condition has substantially changed such he is no longer a danger to the community and may be released.[12] By specifying what evidence *79 does or does not demonstrate a changed condition, the Legislature gave Washington courts a facially neutral law to apply to pending litigation. In so doing, it did not violate the separation of powers doctrine.[13]
¶ 42 Fox, Jones, and Jacka counter-argue that amended RCW 71.09.090 limits the type of evidence and the weight of evidence trial courts are permitted to analyze in SVP probable cause hearings. See Sofie v. Fibreboard Corp., 112 Wash.2d 636, 651, 771 P.2d 711 (1989) (legislature has power to shape litigation, but it may not intrude on jury's fact-finding ability). They assert that (1) the Legislature infringes on the judiciary's independence when it instructs the courts how to rule on evidence, the admissibility of which is governed by court rules and decisions; and (2) by limiting a court's decision to whether an SVP has completed a treatment regime or suffered a debilitating malady threatens the court's independent analysis of whether a previously committed SVP remains a danger to the community.
¶ 43 The three SVPs here correctly note that Washington courts have previously held actuarial evidence admissible in SVP cases. See In re Detention of Thorell, 149 Wash.2d 724, 753, 72 P.3d 708 (2003).[14] Although the SVP Act statutory amendments limit what factors courts may consider in determining whether an SVP's mental or physical condition has changed, nothing in amended RCW 71.09.090 limits the court's ability to weigh and to analyze actuarial risk assessments during probable cause hearings. Rather, the amended statute simply states that in order to present expert testimony on this subject, the SVP must demonstrate that his condition has changed beyond more than a single demographic factor.
¶ 44 The Legislature's amendments clarify that the SVP Act's goal is to ensure that SVPs receive treatment for their mental disorders. The Legislature possesses broad authority in dictating the type of medical proof necessary for an SVP to show probable cause for a new hearing.[15] In amending RCW *80 71.09.090, the Legislature has not mandated that the courts admit or reject specific evidence or weigh certain pieces of evidence. Rather, the Legislature has provided clarity for the courts about the statute's definition of an SVP's "changed condition" sufficient to warrant reconsideration of his continued commitment under the Act.
¶ 45 Applying RCW 71.09.090 to the three SVPs here does not deprive them of an opportunity to present actuarial data to a trial judge or jury. The statute merely requires that they first produce some evidence showing some change in their mental conditions to demonstrate their progress in SVP treatment. Similar to Division I's rejection an analogous separation of powers argument, in the retroactivity context, in Smith, 137 Wash. App. at 327-328, 153 P.3d 226, we find no separation of powers violation in the manner in which the 2005 SVP Act amendments operated to preclude Fox's, Jones', and Jacka's requests for new commitment hearings based on their respective failures to produce evidence of changes in their conditions warranting such hearings.

D. Due Process
¶ 46 The three SVPs also argue that amended RCW 71.09.090 violates their due process rights under the 14th Amendment to the United States Constitution. This argument similarly fails.
¶ 47 The United States Supreme Court has recognized that the Due Process clause of the Fourteenth Amendment provides "a substantive component that bars certain arbitrary, wrongful government actions." Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (quoting Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). A person's right to be free from physical restraint "has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action." Foucha, 504 U.S. at 80, 112 S.Ct. 1780. The Supreme Court has long held that civil commitments represent a significant liberty deprivation and merit the protection of the Due Process Clause. See e.g., Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).
¶ 48 "A court will presume that a statute is constitutional and it will make every presumption in favor of constitutionality where the statute's purpose is to promote safety and welfare, and the statute bears a reasonable and substantial relationship to that purpose." State v. Glas, 147 Wash.2d 410, 422, 54 P.3d 147 (2002) (plurality opinion). The Washington Supreme Court has previously upheld the constitutionality of a show cause hearing under Washington's SVP law. See In the Matter of the Detention of Petersen, 145 Wash.2d 789, 799, 42 P.3d 952 (2002). In Petersen, the Court ruled that the State bears the burden of demonstrating probable cause for an SVP's continued civil commitment. 145 Wash.2d at 796, 42 P.3d 952. Thus, there are two ways for an SVP petitioner to proceed to a full evidentiary hearing: (1) by showing a deficiency in the State's evidence or (2) presenting sufficient proof of a changed condition. 145 Wash.2d at 798, 42 P.3d 952.
¶ 49 If, during an SVP's annual review, the SVP challenges the accuracy of the State's report, the trial court order may order a show cause hearing. At the show cause hearing, the State has the burden to show the SVP's continued illness and dangerousness. The State must make its prima facie case for continued commitment by presenting evidence that (1) the SVP's mental abnormality or personality disorder has not changed, and (2) this mental abnormality will likely cause the SVP to be a danger to the community if released. Id. Even if the State carries its burden to show cause for continued SVP commitment, the SVP
may present his own evidence which, if believed, would show (1) the prisoner no longer suffers from a mental abnormality or personality disorder, i.e., the prisoner has "so changed," or (2) if the prisoner still suffers from a mental abnormality or personality disorder, the mental abnormality or personality disorder would not likely cause the prisoner to engage in predatory acts of sexual violence if conditionally released to a less restrictive alternative or unconditionally discharged. . . . If the prisoner *81 makes either showing, there is probable cause that continued incarceration is not warranted. Former RCW 71.09.090(2) then mandates the court to set the matter for a full evidentiary hearing.
Id.
¶ 50 The three SVPs argue that amended RCW 71.09.090 violates their due process protections because it prevents their ability to show that they are unlikely to be a danger to the community upon release, regardless of their continued mental abnormalities.[16] They assert that Dr. Wollert's testimony and actuarial risk assessment model would show that, based on their age classifications or other actuarial data, SVPs would now present a lower risk to the community than they did at their original commitment, primarily because they are now older. They argue that (1) under Petersen, an SVP deserves a full evidentiary hearing if he can show that he no longer poses a threat to the community despite his continued mental abnormality or personality defect, 145 Wash.2d at 798-99, 42 P.3d 952; and (2) amended RCW 71.09.090 prevents them from presenting scientific evidence of their lower danger to the community, thereby depriving them of their due process right to be free from civil commitment.[17]
¶ 51 Again, the Legislature amended the statute to clarify that the standard for the probable cause hearing is whether the SVP's condition has so changed as to render him significantly less dangerous to the community than he was at the time of his commitment. Nothing in the statutory amendments prevents the SVP from demonstrating that he has either comported with his behavioral treatment or that he no longer poses a danger to society. Rather, the only change in the statute is the Legislature's clarification that a single demographic factor cannot be the only basis for demonstrating that a person's condition has changed enough to lower his danger to the community.
¶ 52 Moreover, Dr. Wollert did not attempt to correlate his statistical data, showing that advancing age generally brings decreased risk of reoffense, with any of the three petitioners' specific conditions. This failure is particularly striking in the case of Fox, who was already 56 years old when he was last convicted of sexually assaulting a child and was 59 when he was committed as an SVP. Yet, Dr. Wollert used the same general statistical data to opine that, at the age of 61, Fox's risk of reoffending had decreased solely because Fox had aged two years since his commitment. Neither Dr. Wollert nor his statistical data addressed the fact that by the age of 56, Fox already had already sexually assaulted some 30 victims and was continuing to prey sexually on additional young victims. Nor did Dr. Wollert's data attempt to carve out any exception to the norm for someone like Fox, who remained a pedophile at an advanced age, apparently contrary to what the data would otherwise predict.
¶ 53 We further note that the SVPs retain their right to an annual review, where they may present evidence, have an attorney represent them, and challenge the State's evidence. They may present both clinical and actuarial data so long as the SVP's case is not based solely on his having grown older, getting married, or undergoing a gender change. We hold, therefore, that this RCW 71.09.090 clarification does not infringe on existing safeguards that allow SVP petitioners to challenge their continued civil commitment.

*82 E. Equal Protection
¶ 54 Lastly, the SVPs assert that (1) amended RCW 71.09.090 violates the equal protection clause of the 14th Amendment to the United States Constitution because the amended statute would allow admission of Dr. Wollert's report at an initial SVP commitment proceeding, but render it inadmissible at a later show cause hearing to determine whether the SVP's commitment should continue; and (2) the Legislature is thereby arbitrarily excluding the same competent evidence from the show cause hearing and violating the equal protection clause. We disagree.
¶ 55 Washington courts review equal protection challenges to the SVP Act under the rational basis test.[18]In re Turay, 139 Wash.2d 379, 409-10, 986 P.2d 790 (1999), cert. denied, 531 U.S. 1125, 121 S.Ct. 880, 148 L.Ed.2d 789 (2001). A statute will survive rational basis review when the Legislature seeks a "legitimate governmental objective and a rational means of achieving it." Thorell, 149 Wash.2d at 749, 72 P.3d 708. This standard is highly deferential to the Legislature, and even "rational speculation unsupported by evidence or empirical data" prevents a court from finding a law unconstitutional under rational basis review. Thorell, 149 Wash.2d at 749, 72 P.3d 708 (quoting Heller v. Doe by Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)).
¶ 56 Fox, Jones, and Jacka are correct that Dr. Wollert's actuarial evidence, based on age alone, could be admitted as evidence at an initial SVP commitment hearing but then be deemed insufficient for a later show cause hearing to determine continued commitment. This contrast in treatment does not, however, mandate reversal under rational-basis review because there are significant distinctions between the initial SVP commitment procedure and the show cause hearing procedure to consider continued civil commitment: Not only do different statutes govern these two procedures, but also their purposes and their standards of proof differ.
¶ 57 For example, at an initial SVP commitment hearing, the State must prove beyond a reasonable doubt that the defendant, who has not yet been adjudicated an SVP, is a danger to the community. Although the Legislature allows a trial court to receive demographic information evidence at an initial SVP commitment hearing, we are aware of no cases in which the State has so limited its evidence; nor can we conceive of a circumstance in which the State could rely on such non-individualized proof to prove the need for an SVP finding and commitment beyond a reasonable doubt.
¶ 58 In contrast, at the show cause hearing, the State has already met its burden of proof and established that the defendant is an SVP. Thus, the court conducts the hearing to ascertain whether there has been a substantial change in the SVP's condition to warrant reconsidering his SVP status and to consider his release. At this stage, it is rational that something more than mere general demographic information is required to show a change in a specific SVP's dangerousness and to show this particular SVP's readiness for release back into the community.
¶ 59 Fox, Jones, and Jacka additionally argue that the SVP Act amendments create two classes of SVPsthose who engage in SVP treatment and those who do not. Under the amended statute, they assert, only the first group will be able to obtain a new evidentiary hearing on their continued dangerousness, while the second group will never have a new hearing, despite their potentially equal low level of dangerousness. The three SVPs then reason that such classifications fail even under rational-basis review.
¶ 60 The State responds that it has dual statutory purposesto protect the community and to treat sex offenders. In re Pers. Restraint of Young, 122 Wash.2d 1, 26, 857 P.2d 989 (1993). Finding that the State furthers both of these interests under the *83 amended statute, we hold that the amended statute survives rational basis review.

II. JACKA'S DEMONSTRATION OF PROBABLE CAUSE
¶ 61 Jacka is the only SVP of the three who argues that he merits a full evidentiary hearing regardless of amended RCW 71.09.090's constitutionality. We agree.

A. Standard of Review
¶ 62 A committed SVP may establish probable cause warranting a continued commitment hearing either (1) by demonstrating a change in his mental abnormality or personality disorder, or (2) by showing that the he is no longer dangerous. Petersen, 145 Wash.2d at 798-99, 42 P.3d 952. We review de novo a trial court's legal conclusion about whether the evidence meets this probable cause standard.[19]Petersen, 145 Wash.2d at 799, 42 P.3d 952. Thus, "[t]he only question is whether the evidence, or lack thereof, suffices to establish probable cause for an evidentiary hearing." Petersen, 145 Wash.2d at 801, 42 P.3d 952.

B. Case Law
¶ 63 In Petersen, the Washington Supreme Court evaluated whether an SVP demonstrated probable cause for a new evidentiary hearing. 145 Wash.2d at 802, 42 P.3d 952. Peterson's expert performed an in-person evaluation and determined that the State should no longer detain Peterson. Id. The expert based his opinion on the availability of effective medication, a review of Peterson's medical and clinical file, and the evaluated effect of his participation in the treatment program. Id. In addition, the expert "specifically detailed why he concluded [Thorell's] mental abnormality would not likely cause him to engage in predatory acts of sexual violence." Id. The Court reversed the trial court's determination that no probable cause existed to conduct a trial because a jury could determine that Peterson could be released based on the expert's opinion. Id.
¶ 64 In contrast, we recently held that a SVP did not demonstrate probable cause based on a combination of Dr. Wollert's new risk assessment models and his analysis of the SVP's change in condition. In re Detention of Elmore v. State, 134 Wash.App. 402, 418-20, 139 P.3d 1140 (2006), review granted, 79208-9 (Jan. 3, 2007). Dr. Wollert found a change in condition when Elmore had completed three of the six treatment stages and had completed a "wide range of projects and met some of the specific release criteria." 134 Wash.App. at 418, 139 P.3d 1140. We held that Elmore failed to demonstrate probable cause because (1) completing three of six stages implicitly acknowledges a need for further treatment; (2) the legislative amendments do not allow the trial court to focus on new evidence questioning past diagnoses; and (3) under the statute, the trial court cannot use age as the sole factor in assessing an SVP's changed condition. 134 Wash.App. at 417-420, 139 P.3d 1140.

C. Jacka's Changed Circumstances
¶ 65 Jacka argues that he met his burden to merit a new evidentiary hearing based on Dr. Wollert's report, which evaluated his changed condition and the change in scientific evaluation. First, Jacka notes that both the State's and Dr. Wollert's reports demonstrate that he has been an active participant in the rehabilitation program, and he has moved through four of the six treatment phases. Second, Jacka notes that Dr. Wollert partially based his opinion on Jacka's PCL-R score, which is a clinical test rather than actuarial data. Third, Dr. Wollert noted that Jacka had abstained from alcohol for the previous four years, that Jacka had received only one behavioral management report in the previous five years, and that he had never received a behavioral management report for any assaultive or threatening behavior. Finally, Dr. Wollert concluded that "Jacka's project work shows a level of understanding attained by only a small percentage *84 of non-predatory offenders." Appendix B at 24-25. Thus, Jacka argues, he has demonstrated a sufficient basis for a jury to consider whether he is no longer a danger to reoffend.
¶ 66 The State counters that (1) almost all of Dr. Wollert's declaration comprises testimony about changes in general evaluation techniques rather than changes in Jacka's specific condition; (2) the alleged decrease in Jacka's psychopathy is not due to his treatment progress, as mandated by RCW 71.09.090(4)(b)(ii); and (3) Dr. Wollert's assessment of Jacka's treatment progress does not address the statutory standardhow a change in SVP treatment translates into making the SVP safe if unconditionally released into the community at large. See Elmore, 134 Wash.App. at 418, 139 P.3d 1140. The State further contends that Dr. Wollert's evaluation cannot be based both on Jacka's specific treatment progress and general scientific changes in assessing whether a prisoner is still a danger to society; rather, changes in the SVPs themselves can be the only relevant ground on which an expert can base such opinion.
¶ 67 Jacka's case falls between Petersen and Elmore on the issue of whether an SVP has established probable cause to warrant a full evidentiary hearing on continued commitment. We recently held in Elmore that completing three out of the six stages of residential treatment, plus testimony from Dr. Wollert, did not satisfy the probable cause standard. Elmore 134 Wash.App. at 417-20, 139 P.3d 1140.
¶ 68 Nevertheless, although Jacka similarly completed only four of six treatment stages, in contrast with Elmore, here, Dr. Wollert's declaration provides greater detail than he did for Elmore in that Dr. Wollert documents Jacka's specific gains in treatment as well as his significantly lower scores on clinical tests predicting recidivism. Thus, Dr. Wollert's expert opinion is that Jacka's condition has so changed that he no longer meets the criteria for being a sexually violent predator.
¶ 69 While there may be deficiencies in Dr. Wollert's report, Petersen dictates that in determining whether to hold a new evidentiary commitment hearing, the trial court does not weigh the evidence, but rather must simply determine whether evidence exists that the SVP's condition has changed. 145 Wash.2d at 803, 42 P.3d 952. And in Jacka's case, unlike Jones' and Fox's cases, Dr. Wollert's analysis goes beyond mere statistical data based on a single factor such as advancing age. In contrast, he has addressed Jacka's other specific changed conditions suggesting Jacka's potential readiness for release.
¶ 70 Although, as the State correctly notes, Dr. Wollert does not base his opinion exclusively on Jacka's treatment, Dr. Wollert has provided sufficient evidence on which a jury could find that Jacka no longer meets the definition of a sexually violent predator. Moreover, as we previously noted, nothing in the 2005 statutory amendments prevents an SVP from presenting evidence on new scientific methods in addition to evidence of his own changed condition. Thus, progress in the SVP treatment program in conjunction with a change in a single demographic factor can support probable cause for a new evidentiary hearing under the SVP statute.
¶ 71 We hold that (1) Jacka's proffered evidence meets this threshold test for a full evidentiary recommitment hearing under RCW 71.09.090; and (2) therefore, the trial court erred in denying his request for such a hearing.

III. CONCLUSION
¶ 72 We hold that the 2005 amendments to the SVP Act, in particular RCW 71.09.090, are constitutional as enacted and as applied to all three SVPs here. We affirm the trial courts' denial of Jones' and Fox's requests for full evidentiary recommitment hearings. We reverse the trial court's denial of Jacka's request for a recommitment trial and remand for a full evidentiary hearing on whether he continues to meet the statutory definition of an SVP warranting continued commitment.
I concur: HOUGHTON, C.J.
ARMSTRONG, J. (Dissenting).
¶ 73 If, at an annual show cause hearing, a person committed as a sexually violent predator *85 (SVP) makes a prima facie case that probable cause exists to warrant a hearing on whether he continues to meet the definition of an SVP,[20] he is entitled to a new commitment hearing. RCW 71.09.090(2)(a); In re Det. of Petersen v. State, 145 Wash.2d 789, 798-99, 42 P.3d 952 (2002). But our legislature has amended RCW 71.09.090 to restrict the type of evidence a person committed as an SVP can use to make this prima facie case, providing that a change in a demographic factor such as age does not by itself establish probable cause that a person's condition has changed. LAWS OF 2005, ch. 344, § 2; RCW 71.09.090(4)(c).
¶ 74 The majority holds that this amendment to RCW 71.09.090 is constitutional because it clarifies the standard for ordering a probable cause hearing and does not prevent an SVP from showing that because of either his treatment or some other factor, he is no longer dangerous.
¶ 75 Freedom from bodily restraint is at the core of the liberty that the due process clause protects from arbitrary governmental action. Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Involuntary civil commitment is constitutional only if the State shows by clear and convincing evidence that a person both suffers from mental illness and is dangerous. Foucha, 504 U.S. at 75-76, 112 S.Ct. 1780 (citing Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). Like any other kind of civil commitment, commitment of SVPs is constitutional only because, by requiring proof of dangerousness and an additional element such as mental illness, the statute limits confinement to those who suffer from an impairment rendering them dangerous beyond their control. In re Det. of Thorell, 149 Wash.2d 724, 731-32, 72 P.3d 708 (2003).
¶ 76 But involuntary civil commitment of a mentally ill person who is not dangerous is unconstitutional. Foucha, 504 U.S. at 77, 112 S.Ct. 1780 (citing O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). A necessary corollary is that even where an initial commitment was constitutional, the government may not continue confinement where the basis for commitment, whether mental illness or dangerousness, no longer exists. Foucha, 504 U.S. at 77-78, 112 S.Ct. 1780. Thus, where a person committed as an SVP is no longer likely to engage in predatory acts of sexual violence, the justification for his confinement no longer exists and further detention is unconstitutional. As Division One noted in one of the cases that prompted the RCW 71.09.090 amendment, "`[c]urrent dangerousness is a bedrock principle underlying the [sexually violent predator] commitment statute.'" In re Det. of Ward, 125 Wash.App. 381, 386, 104 P.3d 747 (quoting In re Det. of Paschke v. State, 121 Wash.App. 614, 622, 90 P.3d 74 (2004)), review denied, 155 Wash.2d 1025, 126 P.3d 820 (2005).
¶ 77 RCW 71.09.090 prevents an SVP from using certain evidence to make a prima facie case that he is no longer dangerous. For example, as an SVP ages, he may lose the ability or interest to act out violent sexual urges even if he has not suffered paralysis, stroke, dementia, or a similar debilitating condition as contemplated by RCW 71.09.090(4)(b)(i). Yet amended RCW 71.09.090 does not allow the SVP to use advanced age as a possible grounds for a full hearing. And this is so even if all mental health professionals would agree that in a particular case, the SVP's age alone makes it highly unlikely he will commit sexually violent acts. Under such circumstances, the State would no longer be holding the defendant because of his dangerousness, but because it has blocked his access to a hearing on whether he is still dangerous. Where the State creates legal grounds to hold an SVP unrelated to his actual dangerousness, it violates due process. Accordingly, by preventing a committed SVP from potentially showing that his confinement is no longer justified, the State violates his constitutional rights.
*86 ¶ 78 The majority also notes that Dr. Wollert,[21] petitioners' expert, did not correlate his data with the petitioners' specific conditions. But in determining whether the petitioner has made a prima facie case that probable cause exists to warrant a new commitment hearing, the trial court determines only whether the petitioner has alleged facts that, if believed, warrant further proceedings. Petersen, 145 Wash.2d at 797-98, 42 P.3d 952. The trial court must not weigh the evidence at the show cause hearing. Petersen, 145 Wash.2d at 798, 803, 42 P.3d 952. The majority may be correct that Fox's advanced age at the time of his initial SVP commitment makes less credible Dr. Wollert's opinion that Fox no longer meets the definition of an SVP. But the trial court does not determine a proposed witness's credibility at the probable cause hearing; rather, this question is for the jury at a full hearing.
¶ 79 I would reverse and remand these cases for full hearings on whether the defendants are dangerous because they are likely to commit sexually violent crimes.
NOTES
[1] The trial court cancelled Fox's previously scheduled hearing because amended RCW 71.09.090 stated that a new SVP trial could not be held under the circumstances Fox asserted.
[2] Fox also has prior convictions for indecent liberties with a four-year-old in 1975 and third degree assault with sexual motivation in 1994.
[3] Under the statutory procedures, the SVP is generally not present at either the annual review or the show-cause hearing, during which he is represented by counsel and the trial court makes determinations based on the review reports. See RCW 71.09.090(2)(b).
[4] "Project work" is a term the parties use in their briefs without explanation.
[5] RCW 71.09.090(2)(a) provides for

a show cause hearing to determine whether probable cause exists to warrant a hearing on whether the person's condition has so changed that: (i) He or she no longer meets the definition of a sexually violent predator; or (ii) conditional release to a proposed less restrictive alternative would be in the best interest of the person and conditions can be imposed that would adequately protect the community.
Subsection (4) of this statute further provides:
(4)(a) Probable cause exists to believe that a person's condition has "so changed," under subsection (2) of this section, only when evidence exists, since the person's last commitment trial proceeding, of a substantial change in the person's physical or mental condition such that the person either no longer meets the definition of a sexually violent predator or that a conditional release to a less restrictive alternative is in the person's best interest and conditions can be imposed to adequately protect the community.
(b) A new trial proceeding under subsection (3) of this section may be ordered, or held, only when there is current evidence from a licensed professional of one of the following and the evidence presents a change in condition since the person's last commitment trial proceeding:
(i) An identified physiological change to the person, such as paralysis, stroke, or dementia, that renders the committed person unable to commit a sexually violent act and this change is permanent; or
(ii) A change in the person's mental condition brought about through positive response to continuing participation in treatment which indicates that the person meets the standard for conditional release to a less restrictive alternative or that the person would be safe to be at large if unconditionally released from commitment.
(c) For purposes of this section, a change in a single demographic factor, without more, does not establish probable cause for a new trial proceeding under subsection (3) of this section. As used in this section, a single demographic factor includes, but is not limited to, a change in the chronological age, marital status, or gender of the committed person.
RCW 71.09.090(4).
[6] In Young, Division I ordered a full evidentiary hearing after an SVP presented expert testimony showing that he was no longer at a serious risk of reoffending. 120 Wash.App. at 761-62, 86 P.3d 810. The expert testimony was based on statistical data demonstrating that the SVP's change in age lowered his risk of reoffending so much that the State could no longer classify him as an SVP.
[7] In Ward, Division I ordered a full evidentiary hearing for a SVP who committed his offenses as a juvenile. 125 Wash.App. at 388-89, 104 P.3d 747. The SVP presented expert testimony from Dr. Wollert, who relied on the SVP's initial mental abnormality diagnosis and on actuarial data demonstrating that SVPs who committed their offenses as juveniles are at a low risk for reoffending. Id. Reasoning that this evidence made out a prima facie case that the SVP classification was no longer correct, the trial court ordered a full evidentiary hearing. Id. at 389-90, 104 P.3d 747.
[8] The legislative intent section of the bill states that the statute "takes effect immediately [May 9, 2005]." 2005 c. 344 § 4.
[9] Nonetheless, the Legislature clarified that an SVP continues to be able to challenge his commitment on a yearly basis and that he will be able to secure a conditional release to a less secure environment or his outright release if he successfully progresses in his treatment. 2005 c. 344 § 1.
[10] Division I also noted that the Smith did not rely on the pre-2005 version of RCW 71.09.090 because "[g]rowing older did not require any activity on his part." Smith, 137 Wash.App. at 329, 153 P.3d 226.
[11] In Haberman, the Washington Supreme Court evaluated the legislature's addition of a scienter requirement in a civil liability statute. 109 Wash.2d at 137, 744 P.2d 1032. The Court reasoned that the new law did not violate the separation of powers doctrine because it did not dictate how the court should decide a factual issue; rather, it was a facially neutral law for the court to apply to the facts before it. 109 Wash.2d at 144, 744 P.2d 1032.
[12] The legislative history on amended RCW 71.09.090 provides:

The legislature finds that the decisions in In re Young, 120 Wash.App. 753, [86 P.3d 810], review denied, [152] Wash.2d [1035, 103 P.3d 201] (2004) and In re Ward, [125] Wn.App. [Wash.App.] [381, 104 P.3d 751, review denied, 155 Wash.2d 1025, 126 P.3d 820] (2005) illustrate an unintended consequence of language in chapter 71.09 RCW.
The Young and Ward decisions are contrary to the legislature's intent set forth in RCW 71.09.010 that civil commitment pursuant to chapter 71.09 RCW address the "very long-term" needs of the sexually violent predator population for treatment and the equally long-term needs of the community for protection from these offenders. The legislature finds that the mental abnormalities and personality disorders that make a person subject to commitment under chapter 71.09 RCW are severe and chronic and do not remit due solely to advancing age or changes in other demographic factors.
The legislature finds, although severe medical conditions like stroke, paralysis, and some types of dementia can leave a person unable to commit further sexually violent acts, that a mere advance in age or a change in gender or some other demographic factor after the time of commitment does not merit a new trial proceeding under RCW 71.09.090. To the contrary, the legislature finds that a new trial ordered under the circumstances set forth in Young and Ward subverts the statutory focus on treatment and reduces community safety by removing all incentive for successful treatment participation in favor of passive aging and distracting committed persons from fully engaging in sex offender treatment.
. . . .
The legislature also finds that, in some cases, a committed person may appropriately challenge whether he or she continues to meet the criteria for commitment. Because of this, the legislature enacted RCW 71.09.070 and 71.09.090, requiring a regular review of a committed person's status and permitting the person the opportunity to present evidence of a relevant change in condition from the time of the last commitment trial proceeding. These provisions are intended only to provide a method of revisiting the indefinite commitment due to a relevant change in the person's condition, not an alternate method of collaterally attacking a person's indefinite commitment for reasons unrelated to a change in condition. Where necessary, other existing statutes and court rules provide ample opportunity to resolve any concerns about prior commitment trials. Therefore, the legislature intends to clarify the "so changed" standard. 2005
[13] Moreover, the Legislature did not engage in a case by case application of law to a specific set of facts; thus, it did not run afoul of the separation of powers doctrine. See Port of Seattle v. Pollution Control Hearings Bd., 151 Wash.2d 568, 626, 90 P.3d 659 (2004).
[14] A growing body of research suggests that actuarial risk assessments are more reliable than clinical analyses. See Eric S. Janus & Robert A. Prentky, Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility and Accountability, 40 AM.CRIM. L.REV. 1443, 1444 (2003).
[15] See Port of Seattle, 151 Wash.2d at 626, 90 P.3d 659 (legislature has authority to decide which scientific procedure is the appropriate test for water pollution); see also Seeley v. State, 132 Wash.2d 776, 799, 940 P.2d 604 (1997) (despite disagreement among experts, the courts will not substitute their judgment for that of the legislature).
[16] At no point in their briefs do the SVPs argue that the State has failed to present a prima facie case. Rather, Jacka is the only one arguing that he rebutted the State's prima facie case without resorting solely to actuarial data: Jacka asserts that Dr. Wollert's testimony about him (Jacka) was based on his improved condition from his having engaged in treatmenta significant change in condition in addition to his increasing age.
[17] The State counters that the SVPs can file a CR 60(b) motion to vacate their initial SVP commitments based on newly discovered scientific evidence. As the Legislature stated in its findings:

These provisions are intended only to provide a method of revisiting the indefinite commitment due to a relevant change in the person's condition, not an alternate method of collaterally attacking a person's indefinite commitment for reasons unrelated to a change in condition. Where necessary, other existing statutes and court rules provide ample opportunity to resolve any concerns about prior commitment trials.
Laws of 2005 ch. 344 § 1.
[18] Jacka is the only SVP of the three who contends we should review the equal protection argument under a strict scrutiny analysis. He argues that a significant liberty interest is at stake in these cases and, thus, it is appropriate for us to apply the strict scrutiny test. Because we grant his petition on other grounds and remand for a full evidentiary hearing, as he requests, we need not engage in strict scrutiny analysis.
[19] In its Findings of Fact, the trial court simply stated, without analysis, that Jacka did not present sufficient evidence to warrant a new trial. Appendix A at 1. We do not have the Record of Proceedings for the show cause hearing so there is nothing that sheds light on the trial court's reasoning for finding Dr. Wollert's report insufficient.
[20] An SVP is a "person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16).
[21] The legislature is clearly concerned about Dr. Wollert's proposed testimony. The concern can be addressed by measuring Dr. Wollert's testimony against the Frye standard for admissibility of expert testimony, rather than a statutory amendment. See State v. Cauthron, 120 Wash.2d 879, 886-87, 846 P.2d 502 (1993) (citing Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923)).